## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| STEPHEN KEIM, individually and on behalf of all others similarly situated, | Case No: |
| *Plaintiff*, | |
| v. | **JURY TRIAL REQUESTED** |
| JUSTWORKS EMPLOYMENT GROUP LLC, and JUSTWORKS, INC., | |
| *Defendants*. | |

## CLASS ACTION COMPLAINT

Plaintiff Stephen Keim, individually and on behalf of all other similarly situated participants and beneficiaries of the Justworks Retirement Savings Plan (the "Plan"), brings this Class Action Complaint against Justworks Employment Group LLC and Justworks, Inc. ("Justworks") and related entities and individuals (collectively, "Defendants") for breaches of fiduciary duties in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1104, and related provisions.

### Nature of the Action

1.      Justworks manages the Justworks Retirement Savings Plan, a multi-employer defined contribution 401(k) plan established in accordance with ERISA.

2.      This lawsuit seeks to recover damages in the form of losses suffered by the Plan and losses to Plaintiff's retirement savings as well as injunctive and other equitable relief for the Plan and on behalf of the Named Plaintiff and similarly situated participants and beneficiaries of the Justworks 401(k) Plan.

1

3. Under ERISA, Plan fiduciaries, including the plan sponsor, plan administrator, and trustees, are required to act solely in the best interests of Plan participants and beneficiaries, including ensuring that the Plan's expenses and administrative fees are reasonable and not excessive.

4. ERISA imposes duties on plan fiduciaries that are "the highest known to the law." *George v. Kraft Foods Global, Inc.*, 814 F. Supp. 2d 832, 852 (N.D. Ill. 2011) (Castillo, J.); *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982); 29 U.S.C. § 1104(a). Fiduciaries must act with "complete and undivided loyalty to beneficiaries of the trust, and with an eye single to the interests of participants and beneficiaries." *Leigh v. Engle*, 727 F.2d 113, 123 (7th Cir. 1984) (internal quotations and citations omitted). In exercising these duties, ERISA fiduciaries are held to the standard of financial experts in the field of investment management. *See Katsaros v. Cody*, 744 F.2d 270, 275, 279 (2d Cir. 1984); *Liss v. Smith*, 991 F. Supp. 278, 296 (S.D.N.Y. 1998).

5. Fiduciaries must "initially determine, and continue to monitor, the prudence of each investment option available to plan participants," *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007), and must "remove imprudent ones" within a reasonable time, *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828–29 (2015).

6. The marketplace for retirement plan services is established and competitive. Billion-dollar defined contribution plans, like the Plan—which is among the largest 0.2% of defined contribution plans in the United States—have tremendous bargaining power to demand low-cost administrative and investment management services. As fiduciaries to the Plan, Defendants are obligated to limit the Plan's expenses to a reasonable amount, to ensure that each fund in the Plan is a prudent option for participants to invest their retirement savings and priced at a reasonable level for the size of the Plan, and to analyze the costs and benefits of alternatives for

the Plan's administrative and investment structure. Defendants must make those decisions for the exclusive benefit of participants, and not for the benefit of conflicted third parties, such as the Plan's service providers.

7. Instead of using the Plan's bargaining power to reduce expenses and exercising independent judgment to determine what investments to include in the Plan, Defendants squandered that leverage by allowing the Plan's conflicted third-party service providers to dictate the Plan's investment lineup, to include hundreds of their proprietary mutual funds in the Plan, to link their recordkeeping services to the placement of those funds in the Plan, and to collect nearly unlimited asset-based compensation from their proprietary products.

8. The Plan's fiduciaries, including Justworks and its appointed agents, breached their fiduciary duties under ERISA by charging unreasonable and excessive administrative and recordkeeping fees to the Plan, which resulted in a loss of assets for the Plan and its participants.

9. As a direct and proximate result of Defendants' conduct, Plan participants, including Plaintiff, paid excessive fees, suffered diminished retirement savings, and were deprived of the benefits of prudent and loyal fiduciary management of their retirement funds.

10. Plaintiff seeks relief for Defendants' breach of their fiduciary duties. Defendants failed to properly minimize the reasonable fees and expenses of the Plan. Defendants instead incurred expenses that were excessive, unreasonable and/or unnecessary. Defendants failed to take advantage of the Plan's bargaining power to reduce fees and expenses. Defendants failed to offer a prudent mix of investment options. To the extent any fiduciary responsibilities were properly delegated, Defendants failed to ensure that any delegated tasks were being performed prudently and loyally in accordance with ERISA. Defendants failed to properly undertake the requisite monitoring and supervision of fiduciaries to whom they had delegated fiduciary responsibilities.

Defendants failed to discharge their fiduciary duties with the requisite expert care, skill, prudence, and diligence. Defendants enabled other fiduciaries to commit breaches of fiduciary duties for which Defendants are liable.

11.     Through this conduct, Defendants violated their fiduciary obligations under ERISA and caused damages to the Plan and to Plaintiff. Plaintiff brings this action to remedy this unlawful conduct, prevent further mismanagement of the Plan, and obtain equitable and other relief as provided by ERISA.

### Jurisdiction & Venue

12.     Plaintiff seeks relief on behalf of the Plan pursuant to ERISA's civil enforcement remedies with respect to fiduciaries and other interested parties and, specifically, under 29 U.S.C. § 1109 and 29 U.S.C. § 1132.

13.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over the claims that arise under ERISA.

14.     Venue is proper in this District pursuant to Section 502(e) of ERISA, 29 U.S.C. § 1332(e), and 28 U.S.C. § 1391 because Plaintiff resides in this District, Defendants conduct business in this District, the Plan is administered in this District, and a substantial part of the events or omissions giving rise to this action occurred in this District.

15.     Plaintiff has standing to bring this action. Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), authorizes any participant, fiduciary, or the Secretary of Labor to bring suit as a representative of a plan, with any recovery necessarily flowing to a plan. As explained herein, the Plan has suffered millions of dollars in losses resulting from Defendants' fiduciary breaches and remains vulnerable to continuing harm, all redressable by this Court. In addition, although standing under Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), is established by these Plan-wide

4

injuries, Plaintiff and all Plan participants suffered financial harm as a result of the Plan's imprudent investment options and excessive fees, and were deprived of the opportunity to invest in prudent options with reasonable fees, among other injuries.

16.     To the extent Plaintiff must also show an individual injury even though §1132(a)(2) does not provide redress for individual injuries, Plaintiff has suffered such an injury, in at least the following ways:

a.  The named Plaintiff and all participants in the Plan suffered financial harm as a result of the imprudent or excessive fee options in the Plan because Defendants' inclusion of those options deprived participants of the opportunity to grow their retirement savings by investing in prudent options with reasonable fees, which would have been available in the Plan if Defendants had satisfied its fiduciary obligations. All participants continue to be harmed by the ongoing inclusion of these imprudent and excessive cost options and payment of excessive recordkeeping fees.

b.  The named Plaintiff and all participants in the Plan were financially harmed by Defendants' improper bundling of some of the Plan's investment products, improperly allowing the companies who did recordkeeping for the Plan to require inclusion of their investment products in the Plan, instead of each investment option being independently selected.

**The Parties**

17.     Stephen Keim ("Keim") is an adult citizen and domiciliary of the State of Illinois.

18.     Keim is a participant in the Justworks Retirement Savings Plan within the meaning of 29 U.S.C. § 1002(7) and brings this action individually and on behalf of a class of similarly situated Plan participants.

19. Defendant Justworks Employment Group LLC, established in 2013, is a subsidiary of Justworks, Inc., a technology-based human resources platform that provides payroll, benefits, and compliance services to small and midsize businesses across the United States.

20. Both entities are led by Chief Executive Officer Michael Seckler.

21. According to the Plan's 2024 Form 5500, Justworks Employment Group LLC serves as both the plan sponsor and the plan administrator of the Justworks Retirement Savings Plan.

22. The Plan's 2024 Form 5500 filing is signed by Laurel De Cicco in her capacity as Plan Administrator, further confirming that Justworks Employment Group LLC exercises administrative authority over the Plan. The filing identifies the Plan Administrator as the same entity as the Plan Sponsor, reinforcing the operational relationship within the Justworks corporate structure.

23. Defendants are fiduciaries of the Plan within the meaning of 29 U.S.C. § 1002(21)(A) because they exercised discretionary authority and control over the management of the Plan and the disposition of Plan assets, as well as discretionary responsibility in the administration of the Plan.

### Factual Allegations

#### A. ERISA Fiduciary Duties

24. As described in this Complaint, each Defendant is a named fiduciary or a functional fiduciary and/or undertakes fiduciary duties and responsibilities and, therefore, each Defendant is subject to liability for breach of fiduciary duties.

25. ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. 29 U.S.C. §1104(a) states, in relevant part, that:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan; [and]

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

26. Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and for the exclusive benefit of participants in the plan, and not for the benefit of third parties including service providers to the plan such as recordkeepers and those who provide investment products. Fiduciaries must ensure that the amount of fees paid to those service providers is no more than reasonable. DOL Adv. Op. 97-15A; DOL Adv. Op. 97-16A; *see also* 29 U.S.C. §1103(c)(1) (plan assets "shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan").

27. "[T]he duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996); *Katsaros*, 744 F.2d at 279 (fiduciaries must use "the appropriate methods to investigate the merits" of plan investments). Fiduciaries must "initially determine, and continue to monitor, the prudence of each investment option available to plan participants." *DiFelice*, 497 F.3d at 423 (emphasis original); *see also* 29 C.F.R. § 2550.404a-1; DOL Adv. Opinion 98-04A; DOL Adv. Opinion 88-16A. Thus, a defined contribution plan fiduciary cannot "insulate itself from liability by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the

responsibility for choosing among them." *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009). Fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 135 S. Ct. at 1828–29.

28.     Defendants' fiduciary obligations require that, at all times, they conduct themselves with the utmost good faith, loyalty to the Plan; act with the sole purpose of advancing the interests of the Plan, their participants, and beneficiaries; scrupulously avoid all self-interest, duplicity, and deceit; and fully disclose to and inform participants and beneficiaries of all material information.

29.     Defendants, as fiduciaries, are required to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries.

30.     ERISA also imposes fiduciary duties of loyalty and prudence upon Defendants as fiduciaries of the Plan. These fiduciary duties are "the highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).

31.     The fiduciary duty of loyalty requires Defendants to discharge their duties for the exclusive purpose of providing benefits to participants and their beneficiaries.

32.     The fiduciary duty of loyalty requires Defendants to discharge their duties for the exclusive purpose of defraying reasonable expenses of administering the Plan.

33.     Defendants' fiduciary obligations under ERISA require that they exercise the care, skill, and diligence of a prudent expert in these matters.

34.     The fiduciary duty of prudence encompasses a duty to select prudent investments.

35.     Pursuant to the prudent investor rule, fiduciaries are required to incur only costs that are reasonable in amount and appropriate to the investment responsibilities.

36.    Defendants' fiduciary obligations under ERISA require that they discharge their duties with the exclusive purpose of providing benefits to the Plan's participants and beneficiaries and defraying the reasonable costs of administering the Plan.

37.    In addition, under ERISA a fiduciary has a continuing duty to monitor plan investments and remove imprudent ones that exist separately and apart from the fiduciary's duty to exercise prudence in selecting investments.

38.    Failing to closely monitor and/or minimize administrative expenses constitutes a breach of fiduciary duty.

39.    To the extent any Defendants properly delegated fiduciary duties, Defendants are also subject to liability for breach of fiduciary duties to monitor and/or supervise the activities of those fiduciaries to whom such duties have been delegated.

40.    Defendants were obligated to ensure that any delegated tasks were being performed prudently and loyally in accordance with ERISA.

41.    Defendants are also subject to co-fiduciary liability. ERISA imposes explicit co-fiduciary duties on plan fiduciaries. 29 U.S.C. § 1105(a) states, in pertinent part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> (2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

9

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

### FACTUAL ALLEGATIONS

**A.  Defined Contribution Plans, Services, and Fees**

42.  When ERISA was enacted in 1974, defined benefit pension plans were America's retirement system. Such plans are now rarely available to employees in the private sector. "Defined contribution plans dominate the retirement plan scene today." *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 255 (2008).

43.  Defined contribution plans allow employees to contribute a percentage of their pre-tax earnings to the plan, with the employer often matching those contributions up to a specified percentage. Each participant in the plan has an individual account. Participants direct plan contributions into one or more investment options in a lineup chosen and assembled by the plan's fiduciaries. "[P]articipants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826.

44.  The majority of fees assessed to participants in a defined contribution plan are attributable to two general categories of services: plan administration (including recordkeeping), and investment management. These expenses "can sometimes significantly reduce the value of an account in a defined-contribution plan." *Id*.

45.  A plan's fiduciaries have control over defined contribution plan expenses. The fiduciaries are responsible for hiring administrative service providers for the plan, such as a recordkeeper, and for negotiating and approving the amount of fees paid to those administrative service providers. The fiduciaries also have exclusive control over the menu of investment options

to which participants may direct the assets in their accounts. Those selections each have their own fees, which are deducted from the returns that participants receive on their investments.

46. These fiduciary decisions have the potential to dramatically affect the amount of money that participants are able to save for retirement. According to the U.S. Department of Labor, a 1% difference in fees over the course of a 35-year career makes a difference of 28% in savings at retirement. U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, at 1–2 (Aug. 2013).[1] Accordingly, fiduciaries of defined contribution plans must engage in a rigorous process to control these costs and ensure that participants pay no more than a reasonable level of fees. This is particularly true for multi-billion dollar plans like the Plans, which have the bargaining power to obtain the highest level of service and the lowest fees. The fees available to multi-billion dollar retirement plans are orders of magnitude lower than the much higher retail fees available to small investors.

47. The entities that provide services to defined contribution plans have an incentive to maximize their fees by putting their own higher-cost funds in plans and collecting the highest amount possible for recordkeeping. For each additional dollar in fees paid to a service provider, participants' retirement savings are directly reduced by the same amount, and participants lose the potential for those lost assets to grow over the remainder of their careers. Accordingly, participants' retirement security is directly affected by the diligence used by plan fiduciaries to control, negotiate, and reduce the plan's fees.

48. Fiduciaries must be cognizant of providers' self-interest in maximizing fees, and not simply accede to the providers' preferred investment lineup—i.e., proprietary funds that will generate substantial fee revenue for the provider—or agree to the provider's administrative fee quotes without negotiating or considering alternatives. In order to act in the exclusive interest of

---

[1] Available at http://www.dol.gov/ebsa/pdf/401kfeesemployee.pdf.

participants and not in the service providers' interest, fiduciaries must negotiate as if their own money was at stake. Instead of simply accepting the investment funds or fees demanded by these conflicted providers, fiduciaries must consider whether participants would be better served by using alternative investment products or services.

### B.  Defined Contribution Recordkeeping

49.  Recordkeeping is a service necessary for every defined contribution plan. The recordkeeper keeps track of the amount of each participant's investments in the various options in the plan and typically provides each participant with a quarterly account statement. The recordkeeper often maintains a plan website or call center that participants can access to obtain information about the plan and to review their accounts. The recordkeeper may also provide access to investment education materials or investment advice. These services are largely commodities, and the market for recordkeeping services is highly competitive.

50.  There are numerous recordkeepers in the marketplace who are capable of providing a high level of service and who will vigorously compete to win a recordkeeping contract for a jumbo defined contribution plan. These recordkeepers will readily respond to a request for proposal and will tailor their bids based on the desired services (e.g., recordkeeping, website, call center, etc.). In light of the commoditized nature of their services, recordkeepers primarily differentiate themselves based on price, and will aggressively bid to offer the best price in an effort to win the business, particularly for jumbo plans like the Plan.

51.  Some recordkeepers in the market provide only recordkeeping and administrative services, while others provide both recordkeeping services and investment products. The latter group has an incentive to place their own proprietary products in the plan in order to maximize revenues from servicing the plan. As explained below, when faced with such conflicted fund

recommendations, fiduciaries must independently assess whether the provider's investment product is the best choice for the plan, or whether the purpose of providing benefits to participants would be better accomplished by considering other investment managers who may offer superior funds at a better price.

### C.     Defined Contribution Investment Options

52.     Defined contribution fiduciaries have exclusive control over the particular investment alternatives available in the plan to which participants direct and allocate their plan accounts, and the returns on which are credited to participants' accounts.

53.     Each investment option is typically a pooled investment product, such as a mutual fund, and invests in a diversified portfolio of securities in a broad asset class such as fixed income, bonds, or equities. Fixed income funds may include conservative principal protection options, such as stable value funds, or other diversified portfolios of government or corporate debt securities. Equity funds invest in diversified portfolios of stocks of large, mid, or small domestic or international companies in a particular style such as growth or value (or a blend of the two). Balanced funds invest in a mix of stocks and bonds in varying percentages.

54.     Investment options can be passively or actively managed. In a passively managed or "index" fund, the investment manager attempts to match the performance of a given benchmark index by holding a representative sample of securities in that index, such as the S&P 500. In an actively managed fund, the investment manager uses her judgment in buying and selling individual securities (e.g., stocks, bonds, etc.) in an attempt to generate investment returns that surpass a benchmark index, net of fees. Because no stock selection or research is necessary for the manager to track the index and trading is limited, passively managed investments charge significantly lower fees than actively managed funds.

13

55.     Mutual fund fees are usually expressed as a percentage of assets under management, or "expense ratio." For example, if the mutual fund deducts 1% of fund assets each year in fees, the fund's expense ratio would be 1%, or 100 basis points (bps).[2] The fees deducted from a mutual fund's assets reduce the value of the shares owned by fund investors.

56.     Many mutual funds offer their investors different share classes. Retail share classes are marketed to individuals with small amounts to invest. Institutional share classes are offered to investors with large amounts to invest, such as large retirement plans. The different share classes of a given mutual fund have the identical manager, are managed identically, and invest in the same portfolio of securities. The only difference is that the retail shares charge significantly higher fees, resulting in retail class investors receiving lower returns. The share classes are otherwise identical in all respects.

57.     Some mutual funds engage in a practice known as "revenue sharing." In a revenue-sharing arrangement, a mutual fund pays a portion of its expense ratio to the entity providing administrative and recordkeeping services to a plan. The difference in fees between a mutual fund's retail and institutional share classes is often attributable to revenue sharing. To illustrate, a fund's retail share class may have an expense ratio of 100 bps, including 25 bps of revenue sharing, while the institutional share charges 75 bps, with no or lesser revenue sharing. The presence of revenue sharing thus provides an incentive for administrative service providers to recommend that the fiduciary select higher cost funds, including in-house funds of the administrative service provider that pay the provider revenue sharing. "[V]ery little about the mutual fund industry," including revenue sharing practices, "can plausibly be described as transparent[.]" *Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 907 (7th Cir. 2013).

---

[2] One basis point is equal to 1/100th of one percent (or 0.01%).

58. The importance of fees in prudent investment selection cannot be overstated. The prudent investor rule developed in the common law of trusts, which informs ERISA's fiduciary duties, emphasizes "the duty to avoid unwarranted costs[.]" Restatement (Third) of Trusts ch. 17, intro. note (2007); *see Tibble*, 135 S. Ct. at 1828 (analyzing common law of trusts and Restatement (Third) of Trusts §90 in finding a continuing duty to monitor under ERISA). As the Restatement explains, "cost-conscious management is fundamental to prudence in the investment function." Restatement (Third) of Trusts § 90 cmt. b. While a fiduciary may consider higher-cost, actively-managed mutual funds as an alternative to index funds, "active management strategies involve investigation expenses and other transaction costs . . . that must be considered, realistically, in relation to the likelihood of increased return from such strategies." Restatement (Third) of Trusts ch. 17, intro. note; *id*. § 90 cmt. h(2).

59. In light of this effect of fees on expected returns, fiduciaries must carefully consider whether the added cost of actively managed funds is realistically justified by an expectation of higher returns. Restatement (Third) of Trusts ch. 17, intro. note; *id*. § 90 cmt. h(2). A prudent investor will not select higher-cost actively managed funds without analyzing whether a particular investment manager is likely to beat the overwhelming odds against outperforming its benchmark index over time and thus justify the fund's higher investment expenses.

### D. Background and Plan Structure

60. The Justworks Retirement Savings Plan is funded by employee pre-tax contributions that are invested into individual participant accounts.

61. The Plan includes participants who are employees of approximately 5,400 client companies that participate in the Justworks professional employer organization ("PEO") platform.

62. Participants rely on the Plan to save for retirement and entrust Plan fiduciaries to manage and safeguard their retirement assets prudently and loyally in accordance with ERISA.

63. Plan fiduciaries are legally required to manage and monitor the Plan's assets and operations with the goal of increasing the financial security of participants upon retirement.

64. In accordance with ERISA, the Plan files a Form 5500 annually with the United States Department of Labor, reflecting its financial status, assets, and administrative practices.

65. In 2023, the Plan had approximately 107,463 participants and total assets valued at approximately $2,947,607,608 (nearly $2.95 billion).

66. As reflected in the Plan's 2024 Form 5500, the Justworks Retirement Savings Plan is a large defined-contribution retirement plan with approximately 147,007 participants at the end of the 2024 plan year, including approximately 96,206 participants with account balances, placing the Plan among the largest employer-sponsored retirement plans in the United States.

67. Upon information and belief, the Plan holds billions of dollars in retirement assets, giving Defendants substantial bargaining power to obtain lower investment management and recordkeeping costs for Plan participants.

**E.      Recordkeeping and Administrative Services**

68. Defendants failed to satisfy their fiduciary duties by failing to defray the Plan's fees and expenses.

69. When ERISA fiduciaries fail to monitor fees and costs for reasonableness, there are stark financial consequences for retirees. Every extra level of expenses imposed upon plan participants compounds over time and vastly reduces the value of participants' investments available upon retirement. As the Supreme Court has explained, "[e]xpenses, such as management

16

or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015).

70.     The impact of excessive fees on employees' and retirees' retirement assets is dramatic. The U.S. Department of Labor ("DOL") has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career.[3]

71.     Plan participants typically have little appreciation of the fees being assessed to their accounts. Indeed, according to a 2017 survey conducted by TD Ameritrade, only 27% of investors believed they knew how much they were paying in fees as participants in defined contribution plans, and 37% were unaware that they paid defined contribution fees at all.[4] It is incumbent upon plan fiduciaries to act for the exclusive best interest of plan participants, protect their retirement dollars, and ensure that fees are and remain reasonable for the services provided and are properly and fully disclosed. Unfortunately, fiduciaries of defined contribution retirement plans, including large retirement plans like the Plan, also often lack understanding of the fees being charged to the plans that they administer, manage, and control.

72.     Fiduciaries of virtually all large defined contribution plans, including the Plan, hire a single provider for the essential recordkeeping and administrative ("RK&A") services for the plan. These services include, but are not limited to, maintaining plan records, tracking participant account balances and investment elections, providing transaction processing, providing call center

---

[3]*A Look at 401(k) Plan Fees*, U.S. DEPT. OF LAB. 1-2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resourcecenter/publications/a-look-at-401k-plan-fees.pdf.
[4] Ted Godbout, *How Much Do 401(k) Participants Know About Their Plan Fees?* Nat'l Ass'n of Plan Advisors (Feb. 6, 2018) (reporting results of TD Ameritrade's 2017 Investor Pulse Survey) (accessed at https://www.napa-net.org/news/2019/2/how-much-do-401k-participants-know-about-their-plan-fees/)

support and investment education and guidance, providing participant communications, and providing trust and custodial services.

73. The term "recordkeeping" is a catchall term for the entire suite of recordkeeping and administrative services typically provided by a plan's service provider or "recordkeeper." In other words, recordkeeping fees and RK&A fees are one and the same, and the terms are used synonymously.

74. Recordkeepers typically collect their fees in two forms, referred to as "direct" compensation and "indirect" compensation.

75. Direct compensation is paid directly from plan assets and reflected as a deduction in the value of participant accounts.

76. Indirect Compensation is paid to the recordkeeper indirectly by third parties and is not transparent to retirement plan participants. In other words, the fees are taken from the investment options before the value of the investment option is provided to the participant. Thus, in most cases, participants are not aware they are paying these fees. Most indirect compensation is typically collected by recordkeepers through asset-based "revenue sharing."

77. Virtually all recordkeepers are subsidiaries or affiliates of financial services and insurance companies that also provide investment options to defined contribution plans (*e.g.*, mutual funds, insurance products, collective trusts, separate accounts, *etc.*) or have some other ancillary line of business (*e.g.*, consulting) to sell to plans. As a result, all recordkeepers consider the economic benefit of their entire relationship with a defined contribution plan when setting fees for the RK&A services. Simply put, discounts in the RK&A fee rate are often available based on revenues the recordkeeper earns through the provision of other services (*e.g.*, investment

18

management revenues). In many cases, the additional investment management revenues are more than double or triple the revenue earned by the recordkeeper for providing RK&A services.

78. There are two types of essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan). First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" arrangement for a buffet style level of service, meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis. These services include, but are not limited to, the following:

a. Recordkeeping;

b. Transaction processing (which includes the technology to process purchases and sales of participants' assets, as well as providing the participants access to investment options selected by the plan sponsor);

c. Administrative services related to converting a plan from one recordkeeper to another;

d. Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other materials distributed to participants, *e.g.*, summary plan descriptions);

e. Maintenance of an employer stock fund (if needed);

f. Plan document services, including updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

g. Plan consulting services, including assistance in selecting the investment lineup offered to participants;

h. Accounting and audit services, including the preparation of annual reports, e.g., Form 5500s[5] (excluding any separate fees charged by an independent third-party auditor);

i. Compliance support, including assistance interpreting plan provisions and ensuring plan operation complies with legal requirements and plan provisions (excluding separate legal services provided by a third-party law firm); and

j. Compliance testing to ensure the plan complies with U.S. Internal Revenue Service nondiscrimination rules.

79. This suite of essential RK&A services can be referred to as "Bundled RK&A" services. These services are offered by all recordkeepers for one price (typically at a per capita rate), regardless of the services chosen or utilized by the plan. Anyone who has passing familiarity with recordkeepers' responses to requests for proposals, their bids and their contracts understands and appreciates that the services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services; any claim that recordkeeping expenses depend upon the service level provided to a plan is unsupported by prevailing marketplace pricing practices. Nonetheless, fiduciary-defendants all too often attempt to stave off breach of fiduciary duty claims by disingenuously asserting that the cost of Bundled RK&A services depends upon service level, even though such an assertion is plainly untrue based upon the actual marketplace for such services.

80. The second type of essential RK&A services provided by all national recordkeepers, "A La Carte RK&A" services, often have separate, additional fees based on the conduct and use of individual participants. These fees are distinct from the Bundled RK&A

---

[5] The Form 5500 is the annual report that defined contribution plans are required to file with the DOL and U.S. Department of Treasury pursuant to ERISA reporting requirements.

arrangement to ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance. These A La Carte RK&A services typically include, but are not limited to, the following:

    a.   Loan processing;

    b.   Brokerage services/account maintenance (if offered by the plan);

    c.   Distribution services; and

    d.   Processing of qualified domestic relations orders.

81. All national recordkeepers have the capability to provide all the aforementioned RK&A services to large defined contribution plans, including those much smaller than the Plan.

82. For large plans with more than 5,000 participants, any minor variations in the way these essential RK&A services are delivered have no material impact on the fees charged by recordkeepers to deliver the services. Indeed, the industry-wide practice of recordkeepers quoting fees for Bundled RK&A services on a per-participant basis without regard for any individual differences in services requested confirms that recordkeepers view such differences as immaterial and inconsequential from a cost perspective.

83. While recordkeepers in the defined contribution industry attempt to distinguish themselves through marketing and other means, they all offer the same bundles and combinations of services. Accordingly, the market for defined contribution plan RK&A services has become increasingly price competitive, particularly for larger plans, like the Plan, that have a considerable number of participants and significant assets.

84. The marginal cost of adding an additional participant to a recordkeeping platform is relatively low. These economies of scale are inherent in all recordkeeping arrangements for defined contribution plans, including the Plan. As a plan's participant count increases, the

21

recordkeeper's fixed costs of providing RK&A services are spread over a larger population, thereby reducing the average unit cost of delivering services on a per-participant basis.

85. Due to these economies of scale inherent in the recordkeeping relationship, and because the incremental variable costs for providing RK&A depend on the number of participants with account balances in a defined contribution plan, the cost to the recordkeeper on a per-participant basis declines as the number of plan participants increases and, as a result, a recordkeeper will accept a lower fee to provide RK&A as the number of participants in the plan increases.

86. As a result, it is axiomatic in the retirement plan services industry that, all else being equal: (1) a plan with more participants can and will receive a lower effective per-participant fee when evaluated on a per-participant basis; and (2) as participant counts increase, the effective per-participant RK&A fee should decrease, assuming the same services are provided.

87. Similarly, the average cost for a recordkeeper to provide services to a participant does not hinge on that participant's account balance. In other words, it costs a recordkeeper the same amount to provide services to a participant with an account balance of $10,000 as it does to provide services to a participant with a balance of $1,000,000.

88. Informed, prudent plan fiduciaries are aware of these cost structure dynamics and marketplace realities and will leverage the plan's participant count to obtain lower effective per-participant fees.

89. Because recordkeeping fees are paid in dollars, prudent fiduciaries evaluate the fees for RK&A services on a dollar-per-participant basis. This is the current standard of care for ERISA fiduciaries and has been throughout the Class Period.

90. Prudent fiduciaries will regularly ensure that a plan is paying fees commensurate with its size in the marketplace by soliciting competitive bids from recordkeepers other than the plan's current provider. Recognizing that RK&A services are essentially uniform in nature, and that small differences in the services required by a large plan are immaterial to the cost of providing such services, most recordkeepers only require a plan's participant count and asset level in order to provide a fee quote. These quotes are typically provided on a per-participant basis, enabling fiduciaries to easily compare quotes on an apples-to-apples basis to determine if the current level of fees being charged by a plan's recordkeeper is reasonable.

91. Having received quotes, a prudent fiduciary can then negotiate with the plan's current provider for a lower fee or move to a new provider for the same (or better) services at a competitive (or lower) fee. This is because prudent fiduciaries understand that excessive fees significantly and detrimentally impact the value of participants' retirement accounts.

92. After negotiating the fee the plan will pay to the recordkeeper, fiduciaries may allocate the fee among participant accounts at the negotiated per-participant rate or *pro rata* based on participant account balances or use a different, less common method.

**F. Defendants Breached their Fiduciary Duties**

93. As discussed in detail below, Defendants have severely breached their fiduciary duties of prudence and loyalty to the Plan in several significant ways. Plaintiff did not acquire actual knowledge regarding Defendants' breaches at issue here until shortly before the Complaint was filed.

**1. The Plan's Excessive Recordkeeping/Administrative Costs**

94. Administrative fees reflect the compensation paid to the plan administrator for managing the Plan's operations and compliance, such as reporting (including Form 5500 preparation), service coordination, compliance oversight, and overall plan management duties.

95.     The cost of administrative services is largely dependent on the number of participants in the plan being serviced. Larger plans, such as the Plan, typically have the ability to negotiate lower per-participant fees due to economies of scale.

96.     Most defined-contribution plans assess administrative fees on a per-participant basis, ensuring proportionality between cost and size.

97.     Public sources and industry analysis indicate that, for defined-contribution retirement plans comparable in size to the Justworks Retirement Savings Plan—i.e., plans with more than 100,000 participants and multi-billion-dollar asset levels—reasonable administrative and recordkeeping fees typically range between approximately $20 and $40 on a per-participant, per-year basis, and frequently trend toward the lower end of that range due to economies of scale and enhanced bargaining power. Justworks discloses on its own public-facing support page that participants in the Justworks Retirement Savings Plan are charged $86 per participant per year in administrative fees, deducted in quarterly increments of $21.50 from a participant's Empower account.

98.     This fee is imposed on participants regardless of account balance and is charged in addition to underlying investment expenses.

99.     The $86 annual per-participant charge is significantly above the reasonable and typical administrative fee range of $30–$60 per participant paid by plans of comparable size.

100.     During the Class Period, participants paid for RK&A services indirectly through asset-based revenue sharing. The RK&A services provided to the Plan are and were the same standard services identified above and are and were the same as those provided to comparable plans. Justworks provides no services to the Plan and its participants that are unusual or out of the ordinary. Regardless, for large plans like the Plan, any differences in services are immaterial to

pricing considerations. The primary drivers of which are the number of participants and whether the plan fiduciaries employed a competitive process of soliciting bids to determine the reasonable market rate for the services required by the plan

101. According to the Plan's 2023 Form 5500 filing, the Justworks Retirement Savings Plan had:

    a. 107,463 participants

    b. $2,947,607,608 in total Plan assets

    c. $7,683,239 in contract administrator fees

    d. $2,182,716 in investment advisory / management fees

    e. $29,500 in independent audit (IQPA) fees

102. The Plan's recordkeeping and administrative expenses alone amounted to $7,683,239 in 2023, which translates to approximately $71.50 per participant, a figure consistent with—and confirming—Justworks's own disclosure that it charges $86 per participant annually when additional costs are included.

103. These fees are materially in excess of prevailing market rates when compared to other plans with a similar number of participants and comparable or larger asset bases.

104. Since the start of the Class Period, Defendants allowed the Plan to be charged total amounts of RK&A fees that far exceeded the reasonable market rate. The table below sets forth the annual per participant amounts the Plan ultimately paid to Justworks in RK&A fees, per the Plan's Form 5500s.

**Expenses**

| | Code | (a) | (b) |
|---|---|---|---|
| **e** Benefit payment and payments to provide benefits: | | | |
| (1) Directly to participants or beneficiaries, including direct rollovers | 2e(1) | 264585618 | |
| (2) To insurance carriers for the provision of benefits | 2e(2) | | |
| (3) Other | 2e(3) | | |
| (4) Total benefit payments. Add lines 2e(1) through (3) | 2e(4) | | 264585618 |
| **f** Corrective distributions (see instructions) | 2f | | 254126 |
| **g** Certain deemed distributions of participant loans (see instructions) | 2g | | |
| **h** Interest expense | 2h | | |
| **i** Administrative expenses: | | | |
| (1) Salaries and allowances | 2i(1) | | |
| (2) Contract administrator fees | 2i(2) | 7683239 | |
| (3) Recordkeeping fees | 2i(3) | | |
| (4) IQPA audit fees | 2i(4) | 29500 | |
| (5) Investment advisory and investment management fees | 2i(5) | 2182716 | |
| (6) Bank or trust company trustee/custodial fees | 2i(6) | | |
| (7) Actuarial fees | 2i(7) | | |
| (8) Legal fees | 2i(8) | | |
| (9) Valuation/appraisal fees | 2i(9) | | |
| (10) Other trustee fees and expenses | 2i(10) | | |
| (11) Other expenses | 2i(11) | | |

*Figure 1: 2023 Form 5500 document showing $7,931,455 in Total administrative expenses.*

**Expenses**

| | Code | (a) | (b) |
|---|---|---|---|
| **e** Benefit payment and payments to provide benefits: | | | |
| (1) Directly to participants or beneficiaries, including direct rollovers | 2e(1) | 453741814 | |
| (2) To insurance carriers for the provision of benefits | 2e(2) | | |
| (3) Other | 2e(3) | | |
| (4) Total benefit payments. Add lines 2e(1) through (3) | 2e(4) | | 453741814 |
| **f** Corrective distributions (see instructions) | 2f | | 7775 |
| **g** Certain deemed distributions of participant loans (see instructions) | 2g | | 1995090 |
| **h** Interest expense | 2h | | |
| **i** Administrative expenses: | | | |
| (1) Salaries and allowances | 2i(1) | | |
| (2) Contract administrator fees | 2i(2) | 9051168 | |
| (3) Recordkeeping fees | 2i(3) | | |
| (4) IQPA audit fees | 2i(4) | | |
| (5) Investment advisory and investment management fees | 2i(5) | | |
| (6) Bank or trust company trustee/custodial fees | 2i(6) | | |
| (7) Actuarial fees | 2i(7) | | |
| (8) Legal fees | 2i(8) | | |
| (9) Valuation/appraisal fees | 2i(9) | | |
| (10) Other trustee fees and expenses | 2i(10) | | |
| (11) Other expenses | 2i(11) | 163874 | |
| (12) Total administrative expenses. Add lines 2i(1) through (11) | 2i(12) | | 9215042 |
| **j** Total expenses. Add all **expense** amounts in column (b) and enter total | 2j | | 464959721 |
| **Net Income and Reconciliation** | | | |
| **k** Net income (loss). Subtract line 2j from line 2d | 2k | | 1004310974 |
| **l** Transfers of assets: | | | |
| (1) To this plan | 2l(1) | | 778360004 |
| (2) From this plan | 2l(2) | | 793591402 |

*Figure 2: 2024 Form 5500 document showing $9,215,042 in Total administrative expenses.*

26

105.     Despite the Plan's enormous size and bargaining power, Defendants failed to adequately monitor, control, or reduce the Plan's administrative and recordkeeping expenses.

106.     The Justworks Retirement Savings Plan is a defined contribution retirement plan covering more than 107,000 participants and holding approximately $2.9 billion in total plan assets.

107.     Plans of this size possess substantial bargaining power in the marketplace for RK&A services due to the economies of scale inherent in servicing large participant populations.

108.     The marginal cost of providing bundled RK&A services to an additional participant in a defined contribution plan is minimal, particularly for plans exceeding 50,000 participants. As participant counts increase, the fixed costs incurred by recordkeepers in providing essential services—including transaction processing, participant communications, compliance testing, and plan administration—are spread across a larger base of participants, thereby reducing the average per-participant cost of delivering such services.

109.     As a result of these economies of scale, recordkeepers routinely offer materially reduced per-participant pricing to plans with large participant populations, including plans with more than 50,000 participants, and will competitively bid to provide materially identical bundled RK&A services at significantly lower cost than that paid by smaller plans.

110.     Despite the Plan's enormous size and corresponding bargaining power, Defendants failed to leverage the Plan's scale to negotiate reasonable per-participant fees for RK&A services. Throughout the Class Period, Defendants failed to solicit or adequately consider competitive bids from other national recordkeepers capable of providing materially identical bundled RK&A services to the Plan.

111.     Upon information and belief, Defendants maintained or renewed the Plan's

27

recordkeeping arrangement without issuing a request for proposals or otherwise conducting periodic benchmarking analysis to determine whether the Plan was paying a reasonable market rate for RK&A services.

112. Defendants further failed to negotiate for lower per-participant pricing, fixed-fee arrangements, or revenue-sharing offsets that were readily available in the marketplace to plans of comparable size receiving materially identical bundled RK&A services.

113. Throughout the Class Period, the Plan's per-participant RK&A fee remained materially elevated despite substantial participant growth and asset accumulation, indicating that Defendants failed to capture the cost savings associated with the Plan's increasing size.

114. Any additional administrative complexity associated with the Plan's status as a pooled professional employer organization ("PEO") platform does not materially increase the cost of providing bundled RK&A services, which are standardized and offered by all national recordkeepers to large defined contribution plans regardless of plan sponsor structure.

115. Numerous national recordkeepers are capable of providing materially identical bundled RK&A services—including participant web access, call center support, plan-level compliance testing, loan administration, QDRO processing, and trustee and custodial services—at substantially lower per-participant cost.

116. Defendants' failure to leverage the Plan's bargaining power to obtain reasonable RK&A fees, including by failing to solicit competitive bids, conduct periodic benchmarking, or negotiate reduced per-participant pricing, constitutes a breach of the fiduciary duty of prudence and caused the Plan and its participants to pay unreasonable and excessive administrative and recordkeeping fees throughout the Class Period.

117.     The table below (Comparable Plans: RK&A Fees Paid in 2023) lists the RK&A fees paid by similarly sized defined contribution plans, which represent the prices available to the Plan during the Class Period. The table also indicates the number of participants and assets of each plan.

| Comparable Plans: RK&A Fees Paid in 2023[6] | | | | |
| --- | --- | --- | --- | --- |
| Plan | Participants | Assets | Recordkeeping/Admin Fees | Fee Per Participant |
| Justworks Retirement Savings Plan | 107,463 | $2.947B | $7,683,239 | $71.50 |
| UPMC 401(a) Retirement Savings Plan | 104,105 | $4.26B | $2,567,001 | 24.66 |
| CoAdvantage Corporation Retirement Plan | 96,262 | $1.04B | $304,051 | $3.16 |
| Reyes Holdings Retirement Plan | 79,493 | $1.8B | $629,846 | $7.92 |
| TCS 401(k) Plan | 62,724 | $1.9B | $1,679,044 | $26.77 |

118.     The RK&A fees calculated for each similarly sized plan in the table above include all the direct and indirect compensation paid to the recordkeeper disclosed on each plan's Form 5500, accounting for Bundled and any A La Carte services. Specifically, if the pricing structure as

---

[6] Participant counts, plan assets, and recordkeeping and administrative expenses for comparator plans are derived from publicly available Form 5500 Annual Reports filed with the U.S. Department of Labor for the 2023 plan year, including Schedule H and Schedule C disclosures.

described in the plan's Form 5500 reveals that some or all revenue sharing is not returned to the plan, then the appropriate amount of revenue sharing is also included to calculate the RK&A fees. In some cases, the plan's investment options do not contain revenue sharing and, as a result, any indirect revenue is immaterial to the RK&A fees. In other plans, all of the revenue sharing is returned to the plans and is therefore not included in the fee calculation.

119.    The comparable plans above received at least the same RK&A services received by the Plan. Therefore, the fees in the table above are apples-to-apples comparisons in that they include all the fees being charged by each recordkeeper to provide the same RK&A services to similar defined contribution plans.

120.    RK&A services provided to large defined contribution retirement plans are standardized across the marketplace, particularly for plans with participant populations exceeding 50,000 participants.

121.    The comparator plans identified herein received materially identical bundled RK&A services to those provided to the Plan, including but not limited to participant recordkeeping, transaction processing, participant web access, call center support, participant communications, plan-level compliance testing, loan administration, qualified domestic relations order ("QDRO") processing, distribution services, and trustee and custodial services.

122.    Upon information and belief, the comparator plans utilized national recordkeepers capable of providing the same suite of bundled RK&A services provided to the Plan during the Class Period.

123.    None of the comparator plans identified herein received materially different RK&A services that would justify the materially higher per-participant fees paid by the Plan during the Class Period.

124. Any minor variations in plan-level administrative functions or service delivery methods do not materially impact the per-participant cost of providing bundled RK&A services to plans of comparable size.

125. The comparator plans similarly did not receive plan-specific services that were unavailable to the Plan or materially distinguishable from the bundled RK&A services provided to the Plan's participants.

126. Each comparator plan offered materially similar participant-facing services, including account access through web-based platforms, telephonic call center support, participant communications, and plan-level compliance support.

127. The comparator plans likewise received materially similar back-end administrative services, including transaction processing, record maintenance, nondiscrimination testing support, loan processing, distribution processing, and custodial services.

128. The RK&A services provided to the Plan and to the comparator plans were commoditized in nature and were offered by multiple national recordkeepers at substantially similar levels of service quality.

129. As such, the materially lower per-participant RK&A fees paid by the comparator plans for materially identical bundled services provide a meaningful benchmark for determining whether the fees paid by the Plan were reasonable.

130. Because the comparator plans received materially identical RK&A services to those received by the Plan, the disparity in per-participant fees paid by the Plan supports a reasonable inference that Defendants failed to follow a prudent fiduciary process in negotiating and monitoring RK&A fees.

131. No material differences in services provided to the Plan explain or justify the

31

materially higher per-participant RK&A fees paid by the Plan throughout the Class Period.

132.     As the table above indicates, the fees paid by the Plan for virtually the same package of services are much higher than those of plans with comparable, and in many cases smaller, participant counts. Indeed, based on fees paid by other large plans during the Class Period receiving materially identical RK&A services, it is more than reasonable to infer that Defendants failed to follow a prudent process to ensure that the Plan was paying only reasonable fees. In light of the amounts remitted to Justworks throughout the Class Period, Defendants clearly engaged in virtually no examination, comparison, or benchmarking of the RK&A fees of the Plan to those of other similarly sized defined contribution plans, or they were complicit in paying materially in excess of prevailing market rates.

133.     Defendants' failure to recognize that the Plan and its participants were grossly overcharged for RK&A services and their failure to take effective remedial actions amounts to a shocking breach of their fiduciary duties to the Plan. To the extent Defendants had a process in place, it was imprudent and ineffective given the objectively unreasonable fees the Plan paid for RK&A services. Had Defendants appropriately monitored the compensation paid to Justworks and ensured that participants were only charged reasonable RK&A fees, Plan participants would not have lost millions of dollars in their retirement savings over the last six-plus years.

134.     Defendants allowed unreasonable and excessive fees to be charged to the Plan, despite their fiduciary obligation to ensure cost-effectiveness and prudence.

135.     Defendants' failure to negotiate, monitor, benchmark, or otherwise reduce excessive administrative costs directly caused financial harm to the Plan and to the retirement savings of its participants.

136. These failures constitute breaches of the fiduciary duties of prudence and loyalty under ERISA, resulting in substantial and ongoing losses to the Plan.

### 2. Fiduciaries Failed to Use the Plan's Massive Bargaining Power

137. With more than 107,000 participants and nearly $3 billion in assets, the Justworks Plan had enormous bargaining power to negotiate for:

   a. Lower per-participant fees;

   b. Revenue-sharing offsets

   c. Flat-fee arrangements

   d. Institutional pricing

138. Instead, Defendants permitted the Plan to be charged at rates more typical of small and mid-sized plans, not mega-plans with over $2.9B in assets.

139. This failure constitutes a breach of the duty of prudence, the duty of loyalty, and the duty to monitor and control plan expenses.

140. As a direct consequence, hundreds of thousands of dollars—likely millions—were siphoned from participant accounts each year in the form of excessive and unreasonable fees.

### Class Action Allegations

141. 29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. §1109(a).

142. In this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §1132(a)(2), Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as representative of, the following class (the "Class"):

33

All participants and beneficiaries of the Justworks Retirement Savings Plan during the applicable limitations period (the "Class Period").

Excluded from the Class are Defendants and the Judge to whom this case is assigned or any other judicial officer having responsibility for this case who is a beneficiary.

143. This action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

144. Numerosity. Plaintiff is informed and believes that there are at least thousands of Class members throughout the United States. As a result, the members of the Class are so numerous that their individual joinder in this action is impracticable.

145. Commonality. There are numerous questions of fact and/or law that are common to Plaintiff and all the members of the Class, including, but not limited to the following:

a. Whether Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants for the exclusive purpose of providing benefits to participants and their beneficiaries;

b. Whether Defendants breached their fiduciary duties under ERISA by failing to defray the reasonable expenses of administering the Plan; and

c. Whether and what form of relief should be afforded to Plaintiff and the Class;

146. Typicality. Plaintiff has claims that are typical of all the members of the Class. Plaintiff's claims and all the Class members' claims arise out of the same uniform course of conduct by Defendants and arise under the same legal theories that are applicable as to all other members of the Class. In addition, Plaintiff seeks relief for the Plan under the same remedial theories that are applicable as to all other members of the Class.

147. Adequacy. Plaintiff will fairly and adequately represent the interests of the members of the Class. Plaintiff has no conflicts of interest with other members of the Class or

34

interests different from the other members of the Class. Plaintiff has retained competent counsel experienced in class action and other complex litigation, including class actions under ERISA.

148. Superiority. A class action is superior to all other feasible alternatives for the resolution of this matter. The vast majority of, if not all, Class members are unaware of Defendants' breaches of fiduciary duty and prohibited transactions such that they will never bring suit individually. Furthermore, even if they were aware of the claims they have against Defendants, the claims of virtually all Class members would be too small to economically justify individual litigation. Finally, individual litigation of multiple cases would be highly inefficient, a gross waste of the resources of the courts and of the parties, and potentially could lead to inconsistent results that would be contrary to the interests of justice.

149. Potential Risks and Effects of Separate Actions. The prosecution of separate actions by or against individual Class members would create a risk of: (A) inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the Class; or (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

150. Predominance. Common questions of law and fact predominate over questions affecting only individual Class members, and the Court, as well as the parties, will spend the vast majority of their time working to resolve these common issues. Indeed, virtually the only individual issues of significance will be the exact amount of damages recovered by each Class member, the calculation of which will ultimately be a ministerial function and which does not bar Class certification.

151. Defendants have acted on grounds generally applicable to the Class by uniformly subjecting them to the breaches of fiduciary duty described above. Accordingly, injunctive relief, as well as legal and/or equitable monetary relief (such as disgorgement and/or restitution), along with corresponding declaratory relief, are appropriate with respect to the Class as a whole.

152. Plaintiff's counsel will fairly and adequately represent the interests of the Class and are best able to represent the interests of the Class under Rule 23(g) of the Federal Rules of Civil Procedure. Moreover, treating this case as a class action is superior to proceeding on an individual basis and there will be no difficulty in managing this case as a class action.

153. Therefore, this action should be certified as a class action under Rules 23(a) and 23(b)(1) and/or 23(b)(3) of the Federal Rules of Civil Procedure.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Count I: Breach of Fiduciary Duty 29 U.S.C. §1104(a)(1)(A) & (B)
### (on Behalf of the Plaintiff and the Class)

154. Plaintiff incorporates by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

155. Defendants' conduct, as set forth above, violates their fiduciary duties under Sections 404(a)(1)(A), (B) and (D) of ERISA, 29 U.S.C. § 1104(a)(1)(A), (B) and (D), in that Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants and beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the Plan with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (c) by failing to act

in accordance with the documents and instruments governing the Plan. In addition, as set forth above, Defendants violated their respective fiduciary duties under ERISA to monitor other fiduciaries of the Plan in the performance of their duties.

156. Defendants were required to independently assess "the prudence of each investment option" for the Plan on an ongoing basis, *DiFelice*, 497 F.3d at 423, and to act prudently and solely in the interest of the Plan's participants in deciding whether to maintain a recordkeeping arrangement, DOL Adv. Op. 97-16A. Defendants were also required to remove investments that were no longer prudent for the Plan, as the Supreme Court confirmed. *Tibble*, 135 S. Ct. at 1828–29.

157. To the extent that any of the Defendants did not directly commit any of the foregoing breaches of fiduciary duty, at the very minimum, each such Defendant is liable under 29 U.S.C. § 1105(a) because he, she, they, or it was a co-fiduciary and knowingly participated in, or concealed, a breach by another fiduciary, enabled another fiduciary to commit breaches of fiduciary duty in the administration of his, her, their, or its specific responsibilities giving rise to his, her, their, or its fiduciary status, or knowingly failed to cure a breach of fiduciary duty by another fiduciary and failed to take reasonable efforts to remedy such breach

158. As a direct result of Defendants' breaches of duties, the Plan has suffered losses and Plaintiff and members of the Class suffered damages.

159. Total Plan losses will be determined after complete discovery in this case and are continuing.

160. Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and

37

failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

161.    Pursuant to Sections 409 and 502(a)(2) of ERISA, 29 U.S.C. §§ 1109 and 1132, Defendants are liable to restore to the Plan the losses that have been suffered as a direct result of Defendants' breaches of fiduciary duty and are liable for damages and any other available equitable or remedial relief, including prospective injunctive and declaratory relief.

**SECOND CLAIM FOR RELIEF**
**Count II: Failure to Monitor Fiduciaries and Co-Fiduciary Breaches**
**(on Behalf of the Plaintiff and the Class)**

162.    Plaintiff incorporates the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

163.    Justworks is responsible for appointing, overseeing, and removing members of the Administrative Committees, who, in turn, are responsible for appointing, overseeing, and removing members of the Committees.

164.    In light of its appointment and supervisory authority, Justworks had a fiduciary responsibility to monitor the performance of the Committees and their members. In addition, Justworks and the Administrative Committees had a fiduciary responsibility to monitor the performance of the members of the Committees.

165.    A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of Plan assets, and must take prompt and effective action to protect the Plan and participants when they are not.

166. To the extent that fiduciary monitoring responsibilities of Justworks or the Committees were delegated, each Defendant's monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

167. Justworks and the Committees breached their fiduciary monitoring duties by, among other things:

a. Failing to monitor and evaluate the performance of their appointees or have a system in place for doing so, standing idly by as the Plan suffered enormous losses as a result of the appointees' imprudent actions and omissions with respect to the Plan;

b. Failing to monitor their appointees' fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein, in clear violation of ERISA; and

c. Failing to remove appointees whose performances were inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and its participants' retirement savings.

168. As a consequence of these breaches of the fiduciary duty to monitor, the Plan suffered substantial losses. Had Justworks and the Committees discharged their fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct result of the breaches of fiduciary duties alleged herein, the Plan and its participants have lost millions of dollars of retirement savings.

169. Justworks and the Committees are liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this

Count, to restore to the Plan any profits made through use of Plan assets and are subject to other equitable or remedial relief as appropriate.

170. Each of the Defendants also knowingly participated in the breaches of the other Defendants, knowing that such acts constituted breaches; enabled the other Defendants to commit breaches by failing to lawfully discharge their own fiduciary duties; and knew of the breaches by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breaches. Defendants, thus, are liable for the losses caused by the breaches of their co-fiduciaries under 29 U.S.C. § 1105(a).

**THIRD CLAIM FOR RELIEF**
**Count III: In the Alternative, Liability for Knowing Breach of Trust**
**(on Behalf of the Plaintiff and the Class)**

171. Plaintiff incorporates the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

172. In the alternative, to the extent that any of the Defendants are not deemed a fiduciary or co-fiduciary under ERISA, each such Defendant should be enjoined or otherwise subject to equitable relief as a non-fiduciary from further participating in a knowing breach of trust.

173. To the extent any of the Defendants are not deemed to be fiduciaries and/or are not deemed to be acting as fiduciaries for any and all applicable purposes, any such Defendants are liable for the conduct at issue here, since all Defendants possessed the requisite knowledge and information to avoid the fiduciary breaches at issue here and knowingly participated in breaches of fiduciary duty by permitting the Plan to offer imprudent investment options and pay excessive recordkeeping and administrative fees, all of which was unjustifiable in light of the size and characteristics of the Plan.

**Relief Requested**

174.    Accordingly, Plaintiff, individually and on behalf of the proposed Class, respectfully requests that this Court award:

a.  Declaratory and injunctive relief pursuant to Section 502 of ERISA, 29 U.S.C. § 1132, as detailed above;

b.  Equitable, legal, or remedial relief to return all losses and/or for restitution and/or damages as set forth above, plus all other equitable or remedial relief as the Court may deem appropriate pursuant to Sections 409 and 502 of ERISA, 29 U.S.C. §§ 1109 and 1132;

c.  Pre-judgment and post-judgment interest at the maximum permissible rates, whether at law or in equity;

d.  Attorneys' fees, costs and other recoverable expenses of litigation; and

e.  Such further and additional relief the Court deems appropriate and just under all of the circumstances.

**Jury Demand**

175.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff, individually and on behalf of the proposed Class, demands a trial by jury on all issues so triable.

**NOTICE PURSUANT TO ERISA § 502(h)**

To ensure compliance with the requirements of Section 502(h) of ERISA, 29 U.S.C. § 1132(h), the undersigned hereby affirms that, on this date, a true and correct copy of this Complaint was served upon the Secretary of Labor and the Secretary of the Treasury by certified mail, return receipt requested.

Dated: February 26, 2026                          Respectfully Submitted:

By:    /s/ Brandon M. Wise

Brandon M. Wise – IL Bar # 6319580
Domenica M. Russo – IL Bar # 6345238
**PEIFFER WOLF CARR**
**KANE CONWAY & WISE, LLP**
One US Bank Plaza, Suite 1950
St. Louis, MO 63101
T: 314.833.4827
bwise@peifferwolf.com
drusso@peifferwolf.com

Don Bivens*
**DON BIVENS PLLC**
15169 N. Scottsdale Road, Suite 205
Scottsdale, AZ 85254
T: 602-762-2661
don@donbivens.com

*Attorneys for Plaintiff, the Plan*
*and the Proposed Class*

*admission *pro hac vice* to be requested

42